2011 Ark. 503

**BANCORPSOUTH BANK, Appellant**

v.

**Gene SHIELDS, Appellee.**

**No. 11–500.**

Supreme Court of Arkansas.

Dec. 1, 2011.

Gary Ray Burbank, El Dorado, for appellant.

Ian W. Vickery, El Dorado, for appellant.

ROBERT L. BROWN, Justice.

This appeal originates from a banking dispute between the appellant, Bancorp-South Bank (Bancorp), and the appellee, Gene Shields (Shields). In February 1982, Shields, an agent for the State Farm Insurance Companies (State Farm), opened an account at the First National Bank of El Dorado (First National Bank), which was the predecessor bank for Bancorp. That account, known as the premium-fund account, was owned by State Farm. The purpose of the account was to allow Shields to deposit premiums collected on insurance contracts. State Farm would then "sweep" the account and transfer those funds to its own accounts at other banking institutions out of state. The Deputy Regional Vice President for State Farm signed this account agreement with First National Bank on behalf of State Farm, and Shields signed as a signatory agent.

According to Shields's complaint filed on October 22, 2009, Billie Oliver, an office manager hired by Shields, began to divert funds in 2008 that were due to be deposited into the premium-fund account. Oliver would keep the money collected from insurance premiums for her own personal use and then falsely report to State Farm that the money had been deposited into the premium-fund account. Before State Farm would transfer the funds from the premium-fund account, Oliver would deposit additional money to prevent the premium-fund account from being overdrawn. Oliver also changed the mailing address on the premium-fund account from a post office box established by Shields to the mailing address of Shields's insurance agency, where she checked the mail. Despite her efforts to prevent overdrawing the premium-fund account, the account was overdrawn. Shields alleges in his complaint that Oliver then intercepted the overdraft notices from Bancorp. Shields further alleges that he suffered at least $77,925.05 in losses as a result of over 100 overdrafts on the premium-fund account.

In Shields's subsequently filed complaint, he alleged that Bancorp was negligent in failing to notify him of the overdrafts. He specifically asserted that his losses were the result of the failure of Bancorp to "properly perform and carry out its duties towards its customer, Gene Shields, as contemplated when the account was established." In its answer, Bancorp denied any negligence and asserted that the contractual agreement required that the controversy be submitted to arbitration. Bancorp requested in its answer that the circuit court dismiss or stay the action pending a ruling in arbitration. Bancorp also filed a counterclaim against Shields, asserting that Shields was liable for a negative balance of $10,988.78 in the premium-fund account. In addition, Bancorp filed a third-party complaint against Oliver, asserting that it was entitled to judgment against Oliver for any sums adjudged to be due as a result of her misappropriation of funds from the premium-fund account.

On April 26, 2010, Bancorp moved to compel arbitration. In that motion, Bancorp asserted that the premium-fund account contained an enforceable arbitration clause that required all controversies relating to the account to be submitted to arbitration. This clause, it stated, was in a document signed by Shields in 2005, known as the "2005 agreement." Shields filed a motion in opposition to the arbitra-

tion motion on May 17, 2010, and argued that his claims were not subject to arbitration, because the Arkansas Uniform Arbitration Act (AUAA) does not permit arbitration for tort claims. He added that his punitive-damage claim was not subject to arbitration and that the 2005 agreement was the result of mutual mistake, making the arbitration clause unenforceable.

On March 24, 2011, the circuit court held a hearing on Bancorp's motion to compel arbitration and Shields's response. At that hearing, the circuit court heard testimony from Betty Bauman, a representative of Bancorp and Gail Shields, Shields's wife. The circuit court also received copies of Shields's account agreements into evidence, together with a portion of Shields's deposition, which was taken on October 7, 2010. After reviewing all of this evidence, the circuit court denied the motion to compel arbitration. An order to that effect was entered on March 24, 2011.

In the circuit court's order, it denied Bancorp's motion to compel arbitration because (1) Shields had made a prima facie case sounding in tort and contract and had made a prima facie claim for punitive damages; (2) under the AUAA, actions sounding in tort and claims for punitive damages are not subject to arbitration; and (3) the 2005 agreement, which includes the arbitration clause, "was executed in contravention of the ownership rights of State Farm and was the result of either a unilateral mistake by the bank, a mutual mistake by the parties, or negligence by the bank," which would be determined later.[1] The circuit court also determined that in the absence of the 2005 agreement, the 1997 agreement, which did not contain an arbitration provision, controlled. Finally,

the circuit court found that the "lack of mutuality of obligations" in the 2005 agreement "raises significant concern about its validity." Notably, there is no finding by the circuit court that the Federal Arbitration Act (FAA) applies or that the contract involved interstate commerce.

On appeal, Bancorp contends that the circuit court erred in denying its motion to compel arbitration, because (1) the circuit court erroneously decided that the AUAA, rather than the FAA applied; (2) it is undisputed that the 2005 agreement involved interstate commerce, so the FAA controls; (3) Shields failed to alleged facts sufficient to support a negligence claim or a claim for punitive damages, which means the AUAA is not appropriate; and (4) the finding that the 2005 agreement was unenforceable because it was executed in contravention of the rights of State Farm is without merit, since the 1997 documents are also unsigned by State Farm.

We initially observe that a circuit court's order denying a motion to compel arbitration is immediately appealable under Arkansas Rule of Appellate Procedure—Civil 2(a)(12) (2011). This court reviews such orders de novo on the record. *Asbury Auto. Used Car Ctr., L.L.C. v. Brosh*, 364 Ark. 386, 388, 220 S.W.3d 637, 639 (2005). The construction and legal effect of an agreement to arbitrate are to be determined by this court as a matter of law. *Id.* This court has held that arbitration is simply a matter of contract between the parties and the question of whether a dispute should be submitted to arbitration is a matter of contract construction. *Tyson Foods, Inc. v. Archer*, 356 Ark. 136, 141, 147 S.W.3d 681, 684 (2004).

---

1. The circuit court's order also makes a finding that Shields had a constitutional right to jury trial in a public forum for the resolution of his claims at law and that the advantage of

docket congestion relief through arbitration was heavily outweighed by Shields's right to a fair and impartial trial. Those findings are not challenged by Bancorp.

■ · There is no dispute between the parties that State Farm opened the premium-fund account with First National Bank in 1982. There is also no dispute between the parties that ownership of the funds in the account was vested "solely and exclusively" in State Farm. It is also undisputed that there was no arbitration provision in the 1982 contract. In 1991, there was a second contract between Shields, First National Bank, and State Farm. Again, according to the terms of that contract, ownership of the account was vested "solely and exclusively" in State Farm. This 1991 contract was signed by the Regional Vice President for State Farm, Shields, and a representative of the bank. Here again, there is no arbitration provision in this contract. According to both the 1982 and the 1991 contracts, Shields had the limited power to "deposit premium funds of a State Farm Insurance Company when they come into the agent's possession" and to draw on the account with checks "to be made payable to a State Farm Insurance Company." Moreover, both contracts provided that the "signatory agent [Shields] has no authority to endorse checks or other negotiable [6]instruments ... for deposit in the Premium Fund Account, for cash, or deposit to the agent's personal account."

In 1997, there is yet another agreement signed by First National Bank and Shields concerning the premium-fund account, but this agreement purports only to update the signatures on the account. Specifically, this agreement purports to give signature rights to four individuals: Gene Shields, Gail Shields, Billie Oliver, and Elaine Brumley, to endorse "checks, drafts, notes, and/or order for payment of money." On this document, the account is identified as a sole proprietorship. A provision in the agreement states that "agents may make account transactions on behalf of the parties but have no ownership or rights at death unless named as Pay–on–Death beneficiaries." The 1997 agreement contains no arbitration provision. State Farm did not sign this agreement.

In 2005, there is another document purporting to change the arrangement for the premium-fund account. In this contract, the account is identified as a commercial purpose "single-party account (sole proprietorship)" and "Gene Shields DBA Gene Shields State Farm Premium Fund Account" is identified under "Account Owner." The boilerplate language in the contract states that a "single-party account is owned by one person." The 2005 agreement is not signed by State Farm, but it contains an arbitration provision, which reads in part:

If this account is a commercial purpose account, then you agree that any claim, dispute or controversy ("claim") by either you or us, against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this agreement, this account or any transaction, including claims regarding the applicability of the arbitration clause or the validity of all or any part of this agreement, shall be [7]resolved by binding arbitration by the National Arbitration Forum, under the Code of Procedure in effect at the time the claims is made or filed.[2]

During the hearing on the motion to compel arbitration, Betty Bauman, the as-

---

2. Independent of its challenge that this legal dispute should be heard by an arbitrator pursuant to the 2005 agreement, Bancorp does not argue that the validity of the agreement itself must be decided by an arbitrator. Accordingly, we will not address that point. *See*

*Reeve v. Carroll County*, 373 Ark. 584, 587, 285 S.W.3d 242, 245 (2008) (noting that this court will not make a party's argument for them or raise an issue sua sponte, unless it involves a matter of jurisdiction).

sistant vice president of deposit operations, testified that in 1982 the premium-fund account was owned by State Farm and that State Farm continued to be the owner in 1991. She also acknowledged that the owner of the account would have to sign any change in the account. She further acknowledged that State Farm did not sign the 2005 agreement. Ms. Bauman testified that the 2005 document was prepared by Bancorp.

In addition to Ms. Bauman, Gail Shields testified at the hearing held to compel arbitration that she went to the bank in 2005 to add her children as payable-on-death beneficiaries on her personal accounts with her husband. While there, she noticed that on one of Shields's and her accounts, their Social Security numbers were reversed. According to Mrs. Shields, the bank representative corrected the numbers and reprinted the form. Mrs. Shields then took the form to Shields, who signed it, and she returned it to the bank. Mrs. Shields testified that when she took the forms to Shields for signature, she did not think she was changing or making any adjustment to the premium-fund account. Mrs. Shields further testified that she knew that, as an agent or employee of State Farm, she did not have the right to alter or amend the premium-fund account.

Because the arbitration provision is part of the 2005 agreement, we must first determine whether that agreement is a valid contract with respect to the premium-fund account. The essential elements of a contract are (1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual agreement, and (5) mutual obligation. *City of Dardanelle v. City of Russellville,* 372 Ark. 486, 490–91, 277 S.W.3d 562, 565–66 (2008). In the instant case, the premium-fund account was owned by State Farm. Fundamental principles of contract law require that the parties to a contract agree to any modification of that contract. *Van Camp v. Van Camp,* 333 Ark. 320, 323, 969 S.W.2d 184, 186 (1998) (citing *Leonard v. Downing,* 246 Ark. 397, 438 S.W.2d 327 (1969)). Those parties must manifest assent to the modification of a contract and to the particular terms of such modification. *Van Camp,* 333 Ark. at 323, 969 S.W.2d at 186.

In the case before us, there was no agreement by the parties to the 1982 contract, State Farm and Bancorp, to modify the premium-fund-account contract in 2005, because State Farm was not a party to that 2005 agreement. As the owner of the account and a party to the 1982 agreement, State Farm would have to agree to any modifications to the account agreement. Again, parties are free to modify a contract between them, but it is essential that both the parties agree to that modification and to its terms. *City of Lamar v. City of Clarksville,* 314 Ark. 413, 424, 863 S.W.2d 805, 812 (1993). Here, that did not happen. As a consequence, the circuit court's ruling was correct. Bancorp cannot enforce the 2005 agreement, including the arbitration provision, that was entered into in contravention of the rights of the account owner, State Farm. It is true that Shields signed the 2005 agreement, but without the agreement of the account owner to modify the account's terms, the modification is not binding.

Affirmed.

GUNTER, J., not participating.