Cite as 2020 Ark. App. 361

# ARKANSAS COURT OF APPEALS
DIVISION II
**No.** CV-19-783

| | |
|---|---|
| SOUTHERN CONSTRUCTION, LLC<br>APPELLANT<br><br>V.<br><br>CHRISTOPHER CALEB HORTON<br>APPELLEE | **Opinion Delivered:** September 2, 2020<br><br>APPEAL FROM THE MARION COUNTY CIRCUIT COURT<br>[NO. 45CV-18-106]<br><br>HONORABLE ANDREW S. BAILEY, JUDGE<br><br>AFFIRMED IN PART; REVERSED AND REMANDED IN PART |

### RITA W. GRUBER, Chief Judge

Appellant Southern Construction, LLC, appeals two orders of the Marion County Circuit Court awarding judgment in favor of appellee Christopher Horton following a dispute regarding construction work. On appeal, Southern argues that the circuit court erred in its interpretation of the construction contract and application of Arkansas Code Annotated section 17-25-103(d) (Supp. 2019) to preclude an offset against a judgment for the balance due under the agreement. We affirm in part and reverse and remand in part.

On June 26, 2017, the parties entered into a construction contract wherein Southern, which is owned by Jared Forbus, agreed to perform construction services to remodel Horton's home. Horton agreed to pay Southern $63,490 for the services. The contract required the work to be completed in a "workmanlike manner according to standard practices" and any "alteration or deviation" from the specified work involving extra costs

to be executed "only upon written orders." On November 21, 2017, the parties entered into a supplemental agreement, which described the remaining work and set a completion date of December 15, 2017.

In July 2018, Horton filed a complaint against Southern for negligent construction and breach of contract, alleging that Southern failed to complete the work as required and that the work performed was not completed in a "professional or competent" manner. Horton alleged that Southern was negligent in the supervision and remodeling of the home, which resulted in serious defects to the home. Horton claimed that as a result of the negligent construction and breach of contract, he suffered damages that would require him to make significant repairs to correct improperly completed work and that the repairs would require him to reside elsewhere and to incur additional interest on his construction loan.

Southern filed an answer denying the claims as well as a counterclaim alleging that Horton defaulted under the agreement by failing to pay the final invoice of $16,998. Horton moved for summary judgment, seeking dismissal of the counterclaim and arguing that Southern was prohibited from pursuing a claim against him under Arkansas Code Annotated section 17-25-103(d) because it was licensed to contract for only residential jobs of less than $50,000. At the outset of the May 2019 bench trial, the circuit court found as a matter of law that Southern was precluded from pursuing the counterclaim and dismissed it with prejudice.

At trial, Horton testified that he entered into the June 2017 contract with Southern to remodel a house for a total cost of $63,490. He explained that there was a November 2017 agreement, which listed the remaining work to be done by December 15, 2017. The

job was not completed by December 17, and he terminated the relationship with Southern "a month or two later." Horton said that Southern presented a bill in early 2018 for final payment of $12,698 due under the contract plus "extras" that he never signed off on.

On cross-examination, Horton testified that he thought the provision of the June 2017 contract stating "remove rotten siding and damaged wood work" meant any rotten woodwork in the house and thus included any rotten floor joists. When asked whether "damaged woodwork" referred to woodwork behind the siding, Horton responded, "That's, I mean, sounds to me like it is covering the whole house. That's why I wanted more description." He acknowledged having signed the agreement without further description.

On redirect, when asked about his expectation regarding the floor joists,[1] Horton testified that he thought any rotten wood would be replaced and the floors leveled. He explained that the cabinets did not sit properly because the floors were not leveled. Horton added that he communicated by text with Forbus regarding the floor joists.[2] Two undated texts included the following response when Horton asked Forbus for progress updates: (1) "Get rotten floor joist repaired and new subfloor and outside 4ft up around house checked and repaid [sic] made. So when windows get here and doors. We can put them right in and

___

[1]Southern objected to this question, stating that it was not allowed under the parol-evidence rule. The court allowed Horton to answer, stating that Horton's "expectation doesn't mean that I'm going to ascribe that as a part of the contract."

[2]Southern objected to the introduction of the text messages on the basis of the parol-evidence rule, arguing that the contract term "remove rotten siding and damaged woodwork" was not ambiguous. Horton argued that it was ambiguous whether damaged woodwork included rotten floor joists. In allowing the introduction of the texts, the circuit court noted Southern's continuing parol-evidence objection.

do siding."; and (2) "Got all but like to [sic] floor joist[s] repair[ed] that were all rotten got the framing around the door repaired[.]"

The next witness to testify was Joe Flowers of the Crawl Space People, which does home leveling, support beams, and termite- and water-damage repair. Flowers stated that the foundation "looked to be okay" but there was a lot of water damage to the floor joists and part of the beam system. He gave Horton a $5,765 bid to make the necessary repairs to shore up the home, which included attaching up to fifty new floor joists to the beams, adding six block piers between piers on the beam system, and possibly adding floor joists under the existing walls. Flowers stated that some of the existing joists were rotten. When asked whether a remodel could have been done on that foundation, Flowers said it could be done but it would not be "straight." He added that the home may never be "straight." Flowers agreed on cross-examination that after the repairs, the floors will likely still have unevenness.

Home inspector Christopher Cochran inspected the property and prepared a report. He spoke of numerous problems, which were outlined in the summary report introduced into evidence, including problems with the siding, the roof, the plumbing, the HVAC and duct work, and the foundation. Regarding the foundation, Cochran noticed rotted joists, which he attributed to moisture in the crawl space that caused mold growth on the joists and the subfloor and rotted the wood. He said that some repairs had been done, such as bridge work between the joists, but the vast majority of the bad areas did not look like they had been addressed. He added that the best time to repair the beams and joists is when the floors are up because the crawl space is tight in some areas of the house. Cochran testified

that if the floor problems are not fixed, "everything else above it is going to be problematic[.]" On cross-examination, Cochran said that he had no knowledge of the remodeling contract.

Contractor John Mitchell submitted a $25,550 proposal to make the inspector's recommended repairs, with the exception of the floor joists. This quote included removing and replacing the flooring in the kitchen, dining room, living room, and entryway. He said that everything around the floor, including the cabinets, had to be removed to repair the floor joists. Mitchell added that all the doors had to be removed and reset, all the trim had to be replaced, and everything needed to be caulked and repainted. There were also sheetrock repairs needed above the doorways and on the ceiling where tape joists could be seen, which would also require repainting. He described the sheetrock job as "poor" regardless of the floor issues. Mitchell said there would be cracks that would need repair after they "jack the house up." He explained that some of the items removed may not be reusable and would have to be replaced. The quote also included the repairs to the siding, roof, and plumbing and the installation of a stairway handrail.

On cross-examination, Mitchell said that the quote was based on replacing items that were torn up because he was not sure if they would be reusable. He stated that the flooring repairs were due to the problems with the floor joists but that the door and sheetrock repairs were half attributable to the floor joists with the other half attributable to the workmanship.

Kevin Grissum of S & M Plumbing testified that he repaired three or four water leaks underneath the house as well as two drain lines that were not connected to the sewer line. In addition, his company made repairs to the whirlpool-tub installation.

The last witness to testify for Horton was his wife, Trista Horton. She testified that when she and her son moved into the home in March 2018, the floors were not level and there were major water leaks. She said that the doors did not shut properly due to the unlevel floors, and they had to put two-by-fours under the kitchen cabinets to level them. The bathtub leaked causing damage to the ceiling below it, which required cutting into the ceiling to discover that a pipe had burst. Also, the shower started to leak, and the spare-bedroom wall had to be cut to make the repair. Trista testified that the first week she was at the house the back porch flooded. The siding had to be removed to find the cause, which was a nail that had been shot through the pipe. Trista spoke to other problems, such as parts of the ceiling had not been textured; floors were dirty, scratched, and had paint on them; rocks were left on the front porch; a burn pit was made in the front yard; and an old refrigerator was left in the yard with its contents that had to be hauled off.

Horton rested following Trista's testimony, and Southern called employee Kevin Devore, who helped with the flooring. He recalled hearing a telephone conversation Forbus had with Horton regarding concern over the condition of the floor joists when the subfloor was up in the kitchen. He heard Forbus talking about how the joists needed to be fixed and at the end of the conversation saying, "[O] kay, fine, you're wanting me to Band-Aid this[.]" Devore never heard that all the floor joists would be repaired. He indicated that new subflooring was installed and floor levelers were placed in certain areas, but he did not know whether any rotten joists were repaired. Devore explained that they "stood up" blocks under the floor joists to "have some support there while we [were] nailing everything on."

Jared Forbus testified that the first page of the June contract described all the demo work, which included "remove rotten siding and damaged wood work." He explained that there was "T1-11" on the outside of the house, which he described as "basically a sheeting and a siding at the same time." He explained that the T1-11 was damaged around the bottom edge of the house, and they planned to replace it four feet up from the ground, along with rotten studs. He stated that nothing in the contract mentioned joist removal or repair, and he never agreed to do any foundation or joist repair. Forbus testified that they learned the floor joists were rotten when rotten portions of the subfloor were removed. He thought the joists needed to be removed and redone; he called Horton to discuss the joists when Devore was present. He explained to Horton that because there was no vapor barrier in the crawl space, the wood wicked up the water and caused it to rot. When Horton asked what needed to be done, Forbus told him the floor joists needed to be replaced and would cost about $3500. Forbus testified that Horton did not want to spend the $3500 because he had just spent $5000 on his truck. Forbus asked, "[D]o you just want me to Band–Aid this thing to death and put it back together," and Horton agreed. Forbus was certain that he explained the risks of not replacing the floor joists, which included nothing being level and resulted in things such as cracking sheetrock. Forbus thought that 90 to 95 percent of the issues could have been avoided if Horton had allowed him to replace the floor joists, explaining that the other problems were minimal.

In addition to the issues related to the floor joists, Forbus also testified about other problems revealed in Cochran's inspection report. He agreed that the plumbers did a "horrible" job but noted that although initially included in the proposal, he forgot to remove

7

the plumbing from the contract. He said instead of arguing with Horton, he tried to "make good on it." Forbus also installed a water heater that was not included in the contract, indicating the existing one was "no good," and he knew if they moved in without hot water it would be a "whole other argument."

On cross-examination, Forbus acknowledged that he was the "expert" on the job, considered the Hortons his friends, made them aware of the house, and went with them to see it before it was purchased. Initially, Forbus stated he was unaware of the foundation and floor-joist issues until the subfloors were removed. When presented with a prior unsigned proposal that contained work not included in the remodeling contract, he acknowledged the handwritten notation "repair floor joists and subflooring as needed" on the back of the proposal. When asked again whether he knew the floor joists were bad before the contract was signed, he replied, "I didn't know they all needed to be replaced." He said he only had one chance to go under the house, which was when he was with Horton and the realtor, indicating it required an appointment because it was a "repo." He stated he never requested an appointment to look at the home again.

When asked to admit that he knew about the floor joists before the phone call with Horton, made when Kevin Devore was present, and that he knew about the floor joists at the time of the unsigned proposal, Forbus replied, "I wouldn't say that." Forbus acknowledged that he sent texts to Horton stating, "Get rotten joist repaired." and "Got all but like to [sic] floor joist[s] repair[ed] that were all rotten," after Horton sent texts asking the plan for the week and for an update on the house. Forbus explained that the floor joists were leaning over so they "put in some blocking to get'em back straight, so we would have

something to nail to, all the way down through there. And the decking would set flat on all that. That is what I meant."

As its last witness, the defense called residential contractor Joseph Gentz. He testified that outside of the issues with the floor joists, the remaining problems identified on the home inspector's report were minor, and none were extremely costly.

The circuit court took the case under advisement and entered a May 15, 2019 order finding that removal of the damaged floor joists was part of the parties' agreement. The order provided in part:

> The main issue of contention between the parties is whether their contract included work to be performed in the home's crawlspace to repair the home's floor joists. All agree that the issue of uneven floors has caused various problems within the home. Mr. Horton contends that the second line of the agreement, whereby Southern agrees to "remove rotten siding & damaged wood work" includes the repair of the damaged floor joists under the home. Southern contends that the removal of the "damaged wood work" applies only to the work to be completed with regard to the home's siding.
>
> Mr. Jared Forbus owns Southern. He testified that he did not go into the home's crawlspace before writing up the contract with Mr. Horton. He also testified that once the problem with the floor joists was discovered he tried to convince Mr. Horton to pay an additional $3,500.00 to repair the issues but that Mr. Horton did not want to incur the additional expense. After determining that the "damaged wood work" term was ambiguous in this instance, the Court allowed extrinsic evidence in the form of text messages between the parties whereby Mr. Forbus indicated had already repaired and intended to repair more floor joists that "were all rotten." The Court also heard testimony from the parties with regard to this issue.
>
> The Court finds that removing the damaged floor joists was part of the parties' agreement. The Court does not find that it was part of the agreement that Southern would take other measures to make the floors level. The Court notes that Mr. Joseph Flowers, Mr. Horton's expert, testified that the floors of the home may never be completely level.

The court further found that Horton had to employ Joe Flowers to repair the floor joists and wooden-beam system, had to purchase plumbing supplies and employ S & M

9

Mechanical to repair the plumbing problems caused by Southern, and had to employ John Mitchell to "to repair needed projects and to finish the renovation according to the original agreement and pursuant to a home inspection report completed by Cochran Home Inspections, LLC, which sets the standard for the Court for workmanlike performance." Based on these findings, the court awarded Horton as follows:

> The Court awards Mr. Horton a judgment against Southern Construction, LLC in the amount of $15,291.22. This amount is based upon the following figures:
>
> 1. $2,837.50 for the expense of adding new floor joists to support the damaged joists and to secure the wooden beam system
>
> 2. $633.00 for plumbing repairs, plus an additional $268.72 for supplies
>
> 3. $23,250.00 for completion of the renovation of the home as contemplated by the original contract; this figure is computed by considering Mr. Mitchell's bid less the following expenses: $900.00 for cabinet work that was never meant to be completed by Southern, $400.00 to remove a capped vent pipe, and $1,500.00 for the installation of a handrail on the interior stairs
>
> 4. $1,000.00 in attorney's fees
>
> 5. An adjustment in Southern's favor in the amount of $12,698.00, which represents the balance due on the original contract[.]

On May 23, 2019, Horton filed a motion for reconsideration asking the court to reconsider the credit in favor of Southern. The court granted Horton's motion for reconsideration and entered an order on June 10, 2019, finding that the credit given to Southern in the original order was improper and modified the judgment accordingly. Southern filed a timely notice of appeal on July 9, appealing both the May 15 and June 10 orders.

The standard of review in a bench trial is whether the circuit court's findings are clearly erroneous. *Barrett v. Thurston*, 2020 Ark. 36, 593 S.W.3d 1. A finding is clearly

erroneous when, although there is evidence to support it, a reviewing court is left with a firm conviction that a mistake has been committed. *Id.*

## I. *Contract Interpretation*

Appellant first contends that the circuit court erred in its interpretation of the construction agreement, raising the following three arguments: (1) the circuit court erroneously failed to address the November agreement and was in error in considering extrinsic evidence given the existence of that agreement; (2) the language of the parties' June agreement is not ambiguous; (3) even if ambiguity existed, it was answered by specific writings created at the time of the four-page construction proposal.

In its first argument, Southern contends that the November agreement superseded the June agreement; thus, the circuit court erred in considering extrinsic evidence to interpret the meaning of the June agreement. In support of its argument, Southern quotes the general common-law proposition "that in the absence of fraud, accident or mistake, a written contract merges, and thereby extinguishes, all prior and contemporaneous negotiations, understandings and verbal agreements on the same subject." *First Nat'l Bank of Crossett v. Griffin*, 310 Ark. 164, 168, 832 S.W.2d 816, 820 (1992) (quoting *Farmers Co-op. Ass'n v. Garrison*, 248 Ark. 948, 952–53, 454 S.W.2d 644, 646–47 (1970)). This statement relied on by Southern is "simply the affirmative expression of the parol evidence rule." *Garrison*, 248 Ark. at 952, 454 S.W.2d at 646.

Southern suggests that the November agreement superseded the June agreement, noting that Horton admitted he signed the agreement referred to as a "punch list" and agreed to its terms. Southern adds that the November agreement was "on the same subject"

11

as the June agreement and thus extinguished "all prior and contemporaneous negotiations, understandings, and verbal agreements" relating to remodeling the house. Horton responds that while Southern couches its argument in terms of "merger," the issue is really one of contract formation. We agree. The November agreement was nothing more than a punch list of items from the June contract remaining to be completed.

Under Arkansas law, there must be additional consideration when the parties to a contract enter into an additional contract. *Youree v. Eshaghoff*, 99 Ark. App. 4, 9, 256 S.W.3d 551, 555 (2007). "Although mutual promises may be adequate consideration to uphold a contract, the promise must have value to the party agreeing to the change; if no benefit is received by the obligee except what he was entitled to under the original contract, and the other party to the contract parts with nothing except what he was already bound for, there is no consideration for the additional contract." *Id.*

Southern, in its reply brief, suggests that the scope of a prior agreement can be modified or limited by a subsequent written agreement. Fundamental principles of contract law require that the parties to a contract agree to any modification of that contract. *Van Camp v. Van Camp*, 333 Ark. 320, 323, 969 S.W.2d 184, 186 (1998) (citing *Leonard v. Downing*, 246 Ark. 397, 438 S.W.2d 327 (1969)). Those parties must manifest assent to the modification of a contract and to the particular terms of such modification. *Van Camp*, 333 Ark. at 323, 969 S.W.2d at 186; *see also BancorpSouth Bank v. Shields*, 2011 Ark. 503, at 8, 385 S.W.3d 805, 809.

The contract to be interpreted is the June contract, not the November agreement. While Southern argues that the court failed to consider the November agreement, it was

entered into evidence, and there was testimony regarding the agreement. Both the document itself and the testimony suggest that it was merely a punch list of items remaining to be completed. While Horton may have assented to the November punch list, it was not a new contract that superseded the June contract or a modification of the June contract.

Next, Southern argues that the circuit court erred in finding that the language of the parties' June contract is ambiguous. It contends that nowhere in the June contract is there a reference to any structural work under the house; the line item at issue ("remove rotten siding & damaged woodwork") is in the conjunctive indicating a relationship between the first and second items listed; and giving the words their plain and ordinary meaning, it is unreasonable to interpret the provision "replace rotten woodwork"[3] to encompass what amounts to a full structural rebuild of the house crawlspace. Horton responds that the circuit court's finding of ambiguity is not clearly erroneous because the disputed provision is susceptible to more than one reasonable interpretation.

Circuit courts initially decide whether a contract is ambiguous. *Keller v. Safeco Ins. Co. of Am.*, 317 Ark. 308, 312, 877 S.W.2d 90, 93 (1994). A contractual provision is ambiguous when there is doubt or uncertainty as to its meaning so that it is open to at least two reasonable interpretations. *Elam v. First Unum Life Ins. Co.*, 346 Ark. 291, 297, 57 S.W.3d 165, 169 (2001). The first rule of interpreting a contract is to give the language employed the meaning that the parties intended, and the court must consider the sense and meanings of the words used by the parties as they are taken and understood in their plain,

---

[3]The contract actually stated Southern would "remove rotten siding & damaged wood work."

13

ordinary meaning. *Cranfill v. Union Planters Bank, N.A.*, 86 Ark. App. 1, 158 S.W.3d 703 (2004). It is also a well-settled rule in construing a contract that the intention of the parties is to be gathered, not from particular words and phrases, but from the whole context of the agreement. *Alexander v. McEwen*, 367 Ark. 241, 244, 239 S.W.3d 519, 522 (2006). It is the duty of the court to construe a contract according to its unambiguous language without enlarging or extending its terms. *Cranfill, supra*. Using these standards of law, we agree with the circuit court that the June 2017 contract is ambiguous.

The disputed phrase "remove rotten siding & damaged wood work" is included on the first page of the contract, which lists the demo work. Southern's argument is that these terms are in the conjunctive, indicating that wood work could refer to the wood only as it relates to the siding. Also under demo, however, is the provision "remove T1-11 and repair as needed." Forbus, by his own testimony, indicated that T1-11 is a combined sheeting and siding product. This is an indication that other line-item terms besides the disputed one also referred to siding. In its brief, Southern argues that the provision "replace rotten wood work" could not reasonably be interpreted to encompass what amounts to a structural rebuild of the crawl space. While the removal of "damaged wood work" and "damaged subfloor as needed throughout" is specified under demo work, the contract does not address any replacements. In reviewing the contract as a whole, there are inconsistencies that cast doubt as to the meaning of the terms used. As such, we cannot say that the circuit court clearly erred in finding the contract ambiguous. Therefore, the circuit court's consideration of extrinsic evidence was proper.

When a contract is unambiguous, the circuit court applies the plain language of the parties' terms and determines as a matter of law how to apply the contract. *Roberts Contracting Co. v. Valentine-Wooten Rd. Pub. Facility Bd.*, 2009 Ark. App. 437, 320 S.W.3d 1. If an ambiguity exists, the circuit court may nonetheless apply the contract as a matter of law if the ambiguity can be resolved by referring to the contract. *See Zulpo v. Farm Bureau Mut. Ins. Co.*, 98 Ark. App. 320, 255 S.W.3d 494 (2007). If the contract's terms cannot sweep away the initial uncertainty, then the court may look outside the contract. *Prochazka v. Bee-Three Dev., LLC*, 2015 Ark. App. 384, at 5, 466 S.W.3d 448, 452. Considerable weight may be given to how the parties themselves understood a contract's terms, as shown by their subsequent statements, acts, and conduct. *Id.* Ambiguities in a written contract are construed strictly against the drafter. *Emis v. Emis*, 2017 Ark. App. 372, at 6, 524 S.W.3d 444, 449 (citing *Byme, Inc. v. Ivy*, 367 Ark. 451, 459, 241 S.W.3d 229, 236 (2006); *Universal Sec. Ins. Co. v. Ring*, 298 Ark. 582, 586, 769 S.W.2d 750, 752 (1989)).

Southern finally contends that even if ambiguity existed, it was answered by specific writings created at the time of the four-page construction proposal. Southern argues that absent from the circuit court's analysis is "the proposal that was rejected by Mr. Horton." It suggests that if extrinsic evidence is considered in interpreting the June contract, the "prior proposal" from Forbus to Horton is "most relevant."

At trial, Forbus initially testified on cross-examination that he was not aware of the floor-joist issues until after the June contract was signed and the subfloors were ripped out. Counsel presented him with a prior unsigned proposal, which, according to the testimony, included items such as granite counters, kitchen tile, and other items that Southern did not

15

end up doing.[4] Forbus acknowledged that the back of this proposal contained a handwritten note stating "repair floor joists and subflooring as needed." Based on this handwritten note, Horton's counsel asked, "So before you ever entered into the contract that was signed, you knew the floor joists were bad. Right?" Forbus responded that he "didn't know they all needed to be replaced."

Relying on this testimony, Forbus suggests that the "inclusion of the 'joist' language in the unsigned proposal, together with the language in the signed proposal, which contains no similar provision, is telling." Further, Forbus contends that the circuit court did not consider the unsigned proposal or the November agreement. However, the circuit court's order states that it allowed the admission of extrinsic evidence in the form of text messages and "heard testimony from the parties with regard to this issue." In addition, the contract itself requires "any alteration or deviation" involving extra costs to "be executed only upon written orders[.]" Forbus also testified that the plumbing work was mistakenly left in the contract and that he provided items, such as the water heater, that were not provided for in the contract.

Here, the circuit court afforded more weight to text messages between Forbus and Horton regarding the floor joists in determining that removing the damaged floor joists was part of the parties' agreement. We give due deference to the superior position of the circuit court to determine the credibility of the witnesses and the weight to be accorded their testimony. *Smith v. Eisen*, 97 Ark. App. 130, 138, 245 S.W.3d 160, 167–68 (2006). Further, it is within the province of the trier of fact to resolve conflicting testimony. *Id.*

---

[4]The unsigned proposal was not admitted into evidence at trial.

16

Upon our review, we are not left with a definite and firm conviction that a mistake has been made. As such, we affirm the circuit court's finding that the contract was ambiguous and hold that the circuit court properly considered parol evidence and found that removing the damaged floor joists was part of the agreement.

## II. *Offset*

Upon reconsideration of its original order offsetting the award in favor of Horton by the amount withheld by Horton under the contract, the circuit court found that the offset was not allowed under Ark. Code Ann. § 17-25-103. Southern contends that the circuit court erred in its interpretation of the statute. We agree.

The correct application and interpretation of an Arkansas statute is a question of law, which this court decides de novo. *Cent. Okla. Pipeline, Inc. v. Hawk Field Servs., LLC*, 2012 Ark. 157, at 9, 400 S.W.3d 701, 707. It is for the appellate court to decide what a statute means, and we are not bound by the circuit court's interpretation. *Id.* The basic rule of statutory construction is to give effect to the intent of the General Assembly. *Id.* In determining the meaning and effect of a statute, the first rule is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Id.*

Arkansas Code Annotated section 17-25-103(d) provides:

> (d) No action may be brought either at law or in equity to enforce any provision of any contract entered into in violation of this chapter. No action may be brought either at law or in equity for quantum meruit by any contractor in violation of this chapter.

Southern argues that subsection (d) only prohibits it from filing an action to enforce the contract based on the plain meaning of the words "action" and "brought."

Action is defined as a civil or criminal judicial proceeding. *Action*, *Black's Law Dictionary* (11th ed. 2019). "Bring" means to "cause to exist," such as to "bring a legal action." Merriam-Webster.com, https://www.merriam-webster.com/dictionary/bring (last visited Aug. 26, 2020). Given these plain definitions, the statutory language is clear that an unlicensed contractor may not file suit to enforce a contract.

Southern argues that regardless of its ability to bring an action to enforce the contract, Horton had to prove any damages resulting from Southern's alleged breach of contract. Horton responds that Southern's interpretation of the statute fails to consider the term "quantum merit" and contends that *Meyer v. CDI Contractors, LLC*, 102 Ark. App. 290, 284 S.W.3d 530 (2008), supports its argument that an offset of the amount due is not allowed. Horton's reliance on *Meyers* is misplaced. The question in *Meyers* did not involve whether an unlicensed contractor could defend against a claim but rather whether an unlicensed subcontractor's fraudulent-inducement claim against the contractor was barred under the statute.

When giving the words of Arkansas Code Annotated section 17-25-103(d) their plain and ordinary meaning, we cannot interpret it to mean that a contractor is unable to defend an action. While this is a matter of first impression in Arkansas, other jurisdictions have reached similar conclusions when interpreting their particular statutes. *See, e.g.*, *Hees v. Burke Constr., Inc.*, 961 A.2d 373, 377 (Conn. 2009) (appellate court agreed with defendant that "under traditional contract damages law, the appropriate measure of damages in a construction contract case is the plaintiffs' reasonable cost to complete or repair the work, less the unpaid balance on the contract" and that Connecticut General Statutes

18

Annotated section 20-249(a)[5] did not alter this principle of contract–damages law.); *Epps v. 4 Quarters Restoration LLC*, 872 N.W.2d 412 (Mich. 2015) (holding Michigan statute that prevents an unlicensed builder from bringing or maintaining a claim against a homeowner does not prevent the unlicensed builder from defending itself against a claim). In conclusion, we hold that the circuit court erred in not allowing Southern the offset for the amount due under the contract and remand for a calculation of damages.

Affirmed in part; reversed and remanded in part.

ABRAMSON and KLAPPENBACH, JJ., agree.

*Jeremy B. Lowrey*, for appellant.

*Ethredge & Copeland, P.A.*, by: *Johnnie A. Copeland*, for appellee.

---

[5]The Connecticut statute provides that no home-improvement contract shall be valid or enforceable against an owner unless certain requirements are met.