Cite as 2025 Ark. App. 549

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-24-37

| | |
|---|---|
| LISA MURPHY; GREGORY KENT THOMAS; FIDDLER'S GREEN MEDICAL MARIJUANA DISPENSARY, LLC; AND ARKANSAS PROPERTY AND WEALTH MANAGEMENT COMPANY, LLC<br><br>APPELLANTS<br><br>V.<br><br>RYAN HANSEN; JONATHAN REEVES; GREYSTONE WELLNESS, LLC; AND HILLTOP REAL ESTATE HOLDINGS, LLC<br><br>APPELLEES | Opinion Delivered November 12, 2025<br><br>APPEAL FROM THE STONE COUNTY CIRCUIT COURT<br>[NO. 69CV-20-57]<br><br>HONORABLE HOLLY MEYER, JUDGE<br><br>REVERSED AND REMANDED |

**KENNETH S. HIXSON, Judge**

Appellants Lisa Murphy; Gregory Kent Thomas; Fiddler's Green Medical Marijuana Dispensary, LLC (Fiddler's Green); and Arkansas Property and Wealth Management Company, LLC (APWMC) (collectively, appellants or Sellers), filed this interlocutory appeal pursuant to Arkansas Rule of Appellate Procedure–Civil 2(a)(6) after the Stone County Circuit Court filed an order granting summary judgment and ordering specific performance in favor of appellees Ryan Hansen; Jonathan Reeves; Greystone Wellness, LLC (Greystone); and Hilltop Real Estate Holdings, LLC (Hilltop) (collectively, appellees or Buyers). On appeal, appellants argue that the circuit court erred in granting appellees summary judgment and ordering specific performance because (1) the Arkansas Medical Marijuana Commission

(MMC) could not have lawfully approved a transfer of Fiddler's Green or its license to appellees; (2) appellees were never ready, willing, and able to pay the purchase price; (3) no contract existed without the conditions precedent being met; (4) the circuit court erred in invalidating the parties' written agreement to amend the asset purchase agreement (APA); and (5) the circuit court erred in denying their motion for summary judgment. We reverse and remand for further proceedings.

## I. *Relevant Facts*

The relevant facts are gleaned from the deposition testimony, affidavits, and other documents attached to the pleadings, opposing motions for summary judgment, and responses thereto as further explained below.

Murphy and Thomas are controlling members in Fiddler's Green, which operates Fiddler's Green Medical Marijuana Dispensary (the Dispensary) in Mountain View, Arkansas. APWMC owns the real property on which the Dispensary operates. Hansen and Reeves approached Murphy in 2020 expressing their interest in purchasing the assets of Fiddler's Green and any associated real property through entities that they intended to later create.[1]

On June 27, 2020, Murphy, Thomas, Hansen, and Reeves signed and executed the APA.[2] The following provisions of the APA are relevant to the issues on appeal:

---

[1]Greystone was eventually created for the purpose of operating the Dispensary, and Hilltop was eventually created for the purpose of owning the real property associated with the Dispensary.

2

THIS PURCHASE AND SALE AGREEMENT ("Agreement") is made and entered into as of June 27, 2020, by and among FIDDLER'S GREEN MEDICAL MARIJUANA DISPENSARY, LLC, an Arkansas limited liability company, LISA MURPHY, and KENT THOMAS, each an individual resident of Arkansas (collectively, with any other individual or entity that holds title to the Assets, the "seller"); and RYAN HANSEN and JONATHAN REEVES, each an individual resident of Arkansas (collectively, with such holding companies that the foregoing men shall create, the "Buyer").

. . . .

2.1    The Purchase Price.  The purchase price for all of the Assets shall be an amount equal to [specific dollar amount redacted] plus that adjusted amount for Inventory delivered at Closing as set forth below (the "Purchase Price").

2.2.    Payment of Purchase Price.  The Purchase Price shall be payable by Buyer as follows:

(a)    Buyer shall deliver Twenty Thousand and No / 100 Dollars ($20,000.00) (the "Earnest Money") to a third-party escrow agent within three (3) business days of Seller's execution of this Agreement, which shall be applied as follows:

(i)    In the event a party terminates the transaction prior to Closing, the Earnest Money shall go to the party entitled to receive those funds under the terms of this Agreement; or

(ii)    At Closing, the Earnest Money shall be delivered to Seller as part of the Purchase Price.

(b)    At Closing, Buyer shall deliver to Seller the remaining [specific dollar amount redacted].

(c)    Buyer and Seller hereby agree that

(i)    the Purchase Price shall be payable at Closing in cash or other immediately available funds by wire transfer at the Closing; and

---

[2]Because Hansen and Reeves apparently did not have the "financial strength" to secure a loan on their own, there were other investors involved.  However, those investors did not sign the APA.

(ii)     In the event that Seller wishes to use a portion of the Purchase Price toward a 1031 Exchange or other legal investment, Purchaser shall cooperate with Seller's delivery instructions to the extent that Purchaser is able to do so without unnecessarily delaying Closing, without incurring additional costs, and in compliance with applicable law.

(d)     Buyer and Seller further agree that Buyer shall pay an amount equal to up to [specific dollar amount redacted] for inventory delivered by Seller to Buyer at Closing.

. . . .

2.3     Allocation of Purchase Price.  Within 10 days prior to the Closing, Buyer and Seller agree to allocate the Purchase Price among the Assets for the purposes of determining the basis of the assets for federal income tax purposes to be reported by each party in accordance with applicable Treasury regulations.  Buyer and Seller agree to allocate the Purchase Price according to the recommendations of their respective counsel and accountants.

. . . .

6.1     Closing Date.  Closing or this Agreement (the "Closing") shall occur on or before the later of (i) August 1, 2020 and (ii) within five (5) business days following that date on which all Contingencies and Due Diligence set forth herein have been met, or at such other time as is mutually agreed upon by the Buyer and the Seller in writing (the "Closing Date").

. . . .

6.3     Deliveries by Seller at Closing.  At the Closing, Seller shall deliver or cause to be delivered to Buyer the following instruments:

(a)     A bill of sale, executed by Seller, in the form acceptable to Buyer's counsel, to transfer to and perfect the title to Buyer in and to all the Fixed Assets, the Inventory, the Customer List, the Employee List, the Business name and intangible property, and all other personal or intangible property of the Business;

4

(b)     A general warranty deed executed by Seller, in the form acceptable to Buyer's counsel, which shall convey and transfer to Buyer all the Real Property;

(c)     An assignment, executed by Seller, in the form acceptable to Buyer's counsel, to assign to Buyer all of Seller's rights in and to the Contracts, the License, the Goodwill, and the Deposits;

(d)     All such further instruments and documents as Buyer may reasonably request for the more effective conveyance, assignment or transfer to Buyer of any Assets.

6.4     Deliveries by Buyer at Closing.  At the Closing, Buyer will deliver to Seller:

(a)     The Purchase Price; and

(b)     All such further instruments and documents as Seller may reasonably request for the more effective conveyance, assignment or transfer to Buyer of any Assets.

CONDITIONS TO OBLIGATION OF BUYER TO CLOSE

Each and every obligation of Buyer under this Agreement to be performed on or prior to the Closing Date shall be subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions:

. . . .

7.5     Contingencies.  Buyer and Seller hereby agree and acknowledge that Buyer's obligation to close the subject transaction is subject to occurrence of certain events and completion of certain tasks, including but not limited to the following (collectively, the "Contingencies"):

(a)     Buyer's receipt and closing of financing from third-party lender ("Lender");

(b)     Lender's approval of the Assets and title thereto, and receipt by Buyer and Lender of such documents, evidence of title, and information Lender requires to close the financing of the Asset purchase;

(c)     Approval of the assignment and transfer of the License by the Arkansas Medical Marijuana Commission;

(d)     Receipt by Buyer of all necessary licenses and permits for operation of the Business at Closing;

(e)     Receipt by Buyer of a commitment for title insurance (the "Title Commitment"] by a title Insurance and closing company meeting the approval of Buyer and Lender, at their reasonable discretion;

. . . .

## CONDITIONS TO SELLERS OBLIGATION

Each and every obligation of Seller under this Agreement to be performed on or prior to the Closing Date, shall be subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions:

. . . .

8.2     <u>Obligations Performed</u>.  Buyer shall have performed and complied with all of its obligations under this Agreement which are to be performed or complied with by it prior to or at the Closing.

. . . .

9.3     <u>Rights to Specific Performance</u>.  If Seller breaches this Agreement through (i) violation of the "no-shop" provision; (ii) a breach of any representation or warranty of Seller set forth herein, and/or the failure of Seller to satisfy any Contingency that is within Seller's direct reasonable control, Buyer may, at Buyer's sole option, either: (a) by written notice to Seller and the escrow agent, terminate this Agreement in its entirety whereupon the Earnest Money shall he paid immediately to Buyer, Seller shall promptly reimburse Buyer its reasonable out-of-pocket and third-party property diligence expenses; or (b) require specific performance by Seller in which event the Closing shall be automatically extended, as necessary.

. . . .

10.9     <u>Modification</u>.  No provisions of this Agreement or any agreement attached hereto or referred to herein may be waived, changed or modified or discharged except by an agreement in writing signed by the party or parties against

whom enforcement of such waiver, change or modification, or by whom discharge is sought.

    10.10  <u>Further Documents and Assurance</u>.  Each of the parties hereto agree to execute all of such further Instruments and documents and to take all such further action as the other party may reasonably require in order to effectuate the terms and proposals of this Agreement.

On June 30, 2020, appellees' counsel, Chad Cumming, contacted the MMC to start the process necessary for the MMC's approval and transfer of the necessary license as required.  Attorney Cumming forwarded the email exchanges to appellants' counsel, Jason Gilbert.  On July 16, 2020, Reeves sent Murphy an email requesting her signature on a proposed transfer-of-ownership application and associated documents (collectively the "TOA"), which needed to be submitted to the MMC in order to receive approval to transfer the necessary license.  The MMC imposes deadlines for submission of a TOA prior to the MMC's monthly meetings.  If a deadline is not met, the MMC will not approve a transfer in ownership until the following month's meeting. The deadline to submit the TOA for consideration during the MMC's July 21, 2020, meeting was on or before noon on July 17, 2020.  However, Murphy did not sign the TOA, and the deadline was not met.

Instead of signing the TOA, Murphy contacted attorney Cumming and stated that she would not sign the TOA without "proof of funds."  In a subsequent email from attorney Cumming to appellants' attorney Gilbert on July 17, 2020, Cumming explained that Murphy's signature on the TOA was necessary because appellees' lender would not close on the loan without the MMC's approval first.  Attorney Cumming further explained that appellees could provide Murphy "some information about the status of the loan, if that

7

reassures her." After some discussion and further email exchanges, Murphy insisted that the purchase funds be placed in an escrow account before she executed the TOA on behalf of Fiddler's Green.

As a result of these discussions, on August 13, 2020, attorney Cumming sent an email to Murphy (Seller), Reeves (Buyer), and Hansen (Buyer). Sellers' attorney Gilbert was also copied on that email. The email stated the following in relevant part:

> Thank you, Lisa [Murphy].
> It's time to make the final preparations to close.
>
> The deadline to submit the application for license transfer of the license is noon on Friday, August 21st.
>
> You have agreed that you will sign the transfer application once the purchase money is placed into escrow.
>
> To get the money into escrow by the application deadline, we will have to sign all of the closing documents by the morning of Thursday the 20th at the latest.
> (Wire deadlines are typically 2:00.)
>
> The title company has agreed to hold both the purchase funds and the closing documents (like the deed and bill of sale) in escrow.
>
> They will be released after the Commission approves the license transfer on Tuesday the 25th.
>
> The deed, the bill of sale and assignment, and all other documents will be dated 8/26/2020, the day after the Commission meeting.
>
> You'll operate the business as usual from Thursday the 20th until the day of the Commission meeting.
>
> Because the title company will be holding original documents and funds in escrow, we should plan to sign closing documents at the title company.

Please plan to meet with my clients and sign closing documents the morning of Thursday, August 20th.

Ryan and Jonathan will also need to meet with you and do inventory, etc. as we prepare to close the deal.

If you have any questions about how this will move forward, please call or email me. Thank you.

At Murphy's suggestion, appellees agreed to use Izard County Abstract Company, Inc. (Izard), as the escrow agent for the purchase funds. However, a few days later, on August 17, 2020, Izard informed the parties that it could not act as escrow agent or provide a title-policy commitment because the transaction involved the sale of a medical marijuana dispensary.

On August 19, 2020, attorney Cumming sent an email to attorney Gilbert that Central Bank of Arkansas (Central Bank) had agreed to serve as escrow agent. A telephone conference was held, during which Central Bank's president and CEO, Wade Ruckle, discussed setting up the escrow account and assured Murphy that the funds were available to close the deal. A loan proceeds account agreement (LPAA) was sent to Murphy for her to sign and finalize setting up the account. Mr. Ruckle testified in his deposition that the LPAA "could" be considered the equivalent of an escrow account and explained that the funds would be "held in a separate account and they are not dispersed until certain things happen." Mr. Ruckle further agreed that Central Bank would not fund the LPAA or escrow account until Murphy "signed the transfer documents to start the process of transferring this license." Mr. Ruckle also stated that Central Bank would have "closed the deal" as long as the MMC "had approved the transfer" of the license. He indicated that it was his understanding from

9

Reeves and Hansen that the MMC had already approved the license transfer.[3] Finally, Mr. Ruckle explained Central Bank "probably" would not have agreed to loan the funds for the sale without J.T. Compton and Clint Mickle[4] agreeing to guarantee the loan. He explained that Mr. Compton and Mr. Mickle were the "financial strength" for this transaction.

On August 21, 2020, attorney Gilbert sent an email to attorney Cumming confirming that he had received Central Bank's LPAA from Murphy the night of August 20, 2020, but he stated that was the only document he received. He further stated the following:

[August 21, 2020. 10:31 a.m.]

Lisa has indicated that she will not be signing the transfer application today because she remains concerned about a number of things: 1) issues related to Par. 1.4(b) of the APA; 2) obtaining signatures for necessary documents from individuals that were not parties to the APA; 3) she does not feel that the account set up at Central Bank is an escrow account is the sense that the bank has just set up an account to hold its own money with no real recourse if it decides not to release the funds to her; 4) Lisa is much less comfortable with the account at Central Bank after what she described as a threatening and verbally abusive call from a bank official yesterday; and 5) she says that seller's statement is incorrect in the allocations of the sales proceeds and that will mess up her 1031 exchange and she wants to talk to her tax person about these allocations.

A series of emails were subsequently exchanged the same day. At 11:06 a.m., attorney Cumming sent an email to attorney Gilbert stating, among other things:

That Loan Proceeds Account Agreement was the proposed document. It does much the same thing as an Escrow Agreement, but it created an account in Lisa [Murphy's] name. As Lisa [Murphy] discussed with Ryan and Jonathan last night, if she's not

---

[3]Obviously, the MMC had not approved the license transfer at this point when the TOA had not been submitted.

[4]J.T. Compton and Clint Mickle were two of the investors referenced in footnote 2.

10

comfortable with that agreement, she was welcome to propose an escrow agreement instead. . . .

Attorney Cumming's email to attorney Gilbert also discussed that Murphy could have proposed a different escrow agreement, but it was too late to switch to Southern Bank at the last minute; that appellees were willing to help with the 1031 exchange but had not received any proposal from Murphy; that Murphy represented that she owned the real property and did not disclose that APWMC owned the property or APWMC would have been included in the APA; that if Murphy does not have the power to speak on behalf of APWMC, why did Murphy offer to sell the real property and agree to do so in the APA; and that Mr. Cumming had no knowledge about anyone being "abusive." Attorney Gilbert sent attorney Cumming another email stating that Murphy had set up a different escrow account with Southern Bank for appellees to use. Attorney Cumming sent the following email to attorney Gilbert in response:

> I just spoke with Ms. Muse at Southern Bank and asked her to send me a proposed escrow agreement.
>
> When I explained that the escrow agreement needed to state that funds would be held in escrow pending marijuana commission approval of the license transfer, Ms. Muse said that she was not told that this would involve a marijuana business. She was told it was just rental property.
>
> She is going to check with her legal counsel and get back to me as soon as possible.
>
> This is problematic for several reasons:
>
> - We cannot deliver purchase money into an escrow account without an escrow agreement.
> - Even if we can work this out with Southern Bank, they said they could not get us that escrow agreement by the noon deadline.

11

- We are not going to cause regulatory problems for Southern Bank by failing to disclose that this is transaction involves the medical marijuana industry. It could cause huge problems for the bank and subject my clients to liability and even criminal charges.

Being unable to resolve their differences, the parties never closed on the sale, and litigation ensued.

## II. *Litigation*

Appellees, Buyers, filed their complaint on September 10, 2020, and first amended complaint on April 16, 2021, for breach of contract seeking specific performance pursuant to section 9.3 of the APA and for promissory estoppel against APWMC. Appellants, Sellers, filed their answers generally denying the complaint and first amended complaint and asking that they be dismissed.

On August 1, 2023, appellants filed a motion for summary judgment and brief in support. The Sellers first argued that the contract was unenforceable under federal and state law because it involved the sale of marijuana for which the use, possession, and distribution of remains illegal under federal law. They further argued that appellees breached the contract by failing to do what was required under the agreement, including (1) failing to agree on the allocation of the purchase price amongst the assets, (2) failing to cooperate with the 1031 exchanges, (3) failing to create an escrow account as stated in the amended agreement, and (4) failing to either deposit the purchase price into an escrow account or otherwise deliver the purchase price. Appellants additionally argued that the contract was void for impossibility of performance because Reeves owed delinquent taxes and therefore

12

was ineligible to receive approval of the transfer of the license from the MMC.[5] Finally, appellants argued that appellees had no claim against APWMC for promissory estoppel and that appellees are asking the circuit court to engage in speculation, to invade the exclusive jurisdiction of the MMC, and to mandate actions by other nonparties to this case.

Appellees, Buyers, filed their response in opposition on August 25, 2023. They disagreed with appellants' assertion that the contract was illegal and argued that Arkansas law and public policy permit the lawful existence and operation of a medical marijuana dispensary. They further argued that they did satisfy the terms of the contract in that they agreed to the allocation of the purchase price but that it was Murphy who indicated that it was contrary to her 1031 exchange on the day after the proposed closing date and that an escrow account was created but appellants failed to execute the necessary closing documents prior to appellees' obligation to fund the account. Appellees argued that the APA was not void for impossibility of performance. They explained that had Murphy signed the TOA, appellees would have performed their "final due diligence checks" before submitting the application to the MMC. In attorney Cumming's affidavit, he averred that he would have performed a routine search once Murphy returned the TOA, discovered any outstanding tax lien, and then ensured that Reeves's state tax lien of $1,588.93 was satisfied before submitting the application. Finally, appellees argued that they did have a claim against

_____

[5] The release of Reeves's lien for delinquent taxes was not recorded until January 8, 2021, several months after the closing date.

13

APWMC for promissory estoppel and were not asking the circuit court to engage in speculation.

Appellants filed their reply on September 6, 2023. They generally argued that appellees failed to meet proof with proof and repeated the arguments made in their motion for summary judgment.

The circuit court held a hearing on appellants' motion for summary judgment on September 7, 2023, during which the parties orally argued their respective positions as set out above. At the conclusion of the hearing, both parties' counsel agreed that the circuit court had "the necessary facts" before it to make a decision. The court questioned why, since the parties agreed, the case was not being presented on cross-motions for summary judgment. Appellees offered to have their response treated as a cross-motion for summary judgment; however, appellants objected and stated that they should be given an opportunity to respond to any cross-motion for summary judgment. Accordingly, the hearing concluded with appellees being allowed time to file a cross-motion for summary judgment.

On September 18, 2023, appellees, Buyers, filed their cross-motion for summary judgment and brief in support. They argued that appellants breached the valid and enforceable APA entitling them to specific performance in that appellants failed to provide a signed TOA as required under the provisions of the APA. They explained that the APA did not require payment or the funds to be placed in an escrow account prior to the execution of the TOA. Appellees further argued that despite appellees' assertions otherwise, the APA's terms relating to the allocation of purchase price and 1031 exchanges did not

14

excuse appellants' nonperformance. Appellees disputed that the August 13, 2020, email constituted a valid amendment because the amendment was not signed by the parties and because there was no additional consideration. Alternatively, they argued that appellants' actions waived any condition even if valid.

Appellants, Sellers, filed a response and brief in support on September 29, 2023. They generally disputed that they breached the APA. Instead, they argued that the APA had conflicting provisions that caused a "chicken and egg issue" in that appellants "did not have to perform until delivery of the Purchase Price at closing, and [appellees] did not have to perform their obligations to close until the License had been transferred." They explained that the solution to the problem was agreed by the parties (primarily, the use of an escrow agent to hold the funds and the necessary documents pending approval by the MMC), and the valid amendment was memorialized and disseminated in an email from attorney Cumming on August 13, 2020. They argued that any signed writing requirement was waived by the parties, that there was additional consideration given for the amendment, and there was no evidence that appellants waived the valid escrow provision. Appellants denied that appellees were entitled to specific performance because appellees failed to deliver the purchase price, failed to agree on an allocation of the purchase price amongst the assets, and failed to cooperate with appellants' 1031 exchange requests. They additionally argued that the contract was unenforceable under federal and state law because it involved the sale of marijuana for which the use, possession, and distribution of remains illegal under federal law; that the contract was void for impossibility of performance because Reeves owed

15

delinquent taxes and therefore was ineligible to receive approval of the transfer of the license from the MMC; that appellees are asking the circuit court to engage in speculation, to invade the exclusive jurisdiction of the MMC, and to mandate actions by other nonparties to this case; and that the APA's terms relating to allocation of purchase price and 1031 exchanges excuse any nonperformance on their part.

Appellees filed a reply on October 9, 2023. They repeated some of their arguments and adopted and incorporated by reference their response in opposition to appellants' motion for summary judgment.

On October 17, 2023, the circuit court held a hearing on all the pending motions for summary judgment.[6] After the circuit court inquired, appellants' counsel stated that the appellees' (Buyers') counsel drafted the APA agreement in this case, and the parties reiterated their arguments made in their motions and responses.

On October 26, 2023, the circuit court entered its order granting appellees' (Buyers') motion for summary judgment and denying appellants' motion for summary judgment and motion for partial summary judgment. The order made the following relevant findings:

> 27. When reading the Agreement's provisions together, it is unambiguous that Defendants were required to provide Plaintiffs with the executed TOA prior to closing on the subject transaction and that Plaintiffs were not required to pay the remaining purchase price prior to closing or to escrow the remaining purchase funds.

> 28. Defendants conditioned refusal to provide Plaintiffs with the executed TOA constitutes a breach of contract as a matter of law, entitling Plaintiffs to summary judgment on their contract claims.

---

[6]Appellants also filed a separate motion for partial summary judgment; however, that motion is not relevant to this appeal.

16

*Plaintiffs Are Entitled to Specific Performance and Equitable Compensation.*

29.     Plaintiffs are entitled to specific performance and equitable compensation in the form of lost profits because of the express terms of the Agreement at paragraph 9.3, and because the subject matter includes the purchase of the Dispensary and its Assets, including its License and Real Property, which are unique under Arkansas law.

. . . .

34.     Accordingly, specific performance is awarded to Plaintiffs, and the Court orders Defendants to provide Plaintiffs with the executed TOA, and if the MMC approves Plaintiffs' license, to convey the Dispensary's Assets to Plaintiffs for the payment of the purchase price by Plaintiffs in accordance with the terms of the Agreement.

35.     Additionally, Plaintiffs may be entitled to equitable compensation for those lost profits they have not received since August 1, 2020.

. . . .

38.     Upon the MMC's approval of Plaintiffs' license and the subsequent closing of the transaction, Plaintiffs may request a hearing on damages to determine the amount of equitable compensation owed to them by Defendants for their breach of contract.

*Plaintiffs Did Not Breach the Contract, and the Disputed Terms Are Not Conditions Precedent.*

39.     The Agreement's terms related to allocation of purchase price and 1031 Exchanges are not conditions precedent excusing Defendants' nonperformance.

. . . .

43.     No provision is included in the Agreement that would release either Plaintiffs or Defendants in the event they are unable to agree to an allocation of the purchase price or to cooperate with 1031 exchanges.

17

44.    There is no language in the contract conditioning the parties' obligations under the Agreement upon the parties first agreeing to an allocation of the purchase price or cooperation of 1031 exchange instructions.

45.    The allocation of the purchase price or cooperation related to 1031 exchanges were not terms that would allow either of the parties to walk away from the closing or otherwise perform their obligations under the Agreement; therefore, these subject provisions do not constitute conditions precedent which would otherwise void the transaction.

46.    Moreover, there is no proof that Defendants ever provided a proposed allocation of the purchase price or 1031 exchange instructions to Plaintiffs, and Defendants' failure to do so cannot create a breach on the part of Plaintiffs of otherwise excuse Defendants' performance given that the law requires a contracting party to not do anything to prevent, hinder, or delay the performance of the contract. *See Cantrell-Waind & Associates, Inc. v. Guillaume Motorsports, Inc.*, 62 Ark. App. 66, 72, 968 S.W.2d 72, 75 (1998).

*No Modification of the Contract Occurred.*

47.    The August 13, 2020 email correspondence from Plaintiffs' transactional attorney cannot constitute a valid modification of the contract because (1) no written modification exists signed by the parties, and (2) no consideration exists for the alleged modification.

48.    As required by the Agreement, no written document regarding the proposed modification was signed by any of the parties; therefore, the August 13, 2020 e-mail failed to modify the terms of the Agreement, and thus Plaintiffs were not required to place the purchase funds in escrow prior to Defendants' execution of the TOA.

49.    Additionally, no consideration exists for the modification proposed in the August 13, 2020 email.

50.    Arkansas courts hold that "a subsequent agreement that purports to modify or change an existing agreement must be supported by consideration other than the consideration involved in the existing agreement. Where there is no new consideration presented for the bargained for item, the new agreement is void and of no effect for lack of mutuality of consideration." *Worden v. Crow*, 2013 Ark. App. 234, at 6–7, 427 S.W.3d 143, 147–48; *see also Youree v. Eshaghoff*, 99 Ark. App. 4, 9 256 S.W.3d 551, 555 (2007).

51.     As the Agreement already required Defendants to execute the TOA, no additional consideration was given by Defendants in exchange for Plaintiffs placing the purchase funds into escrow; therefore, the August 13, 2020 e-mail cannot constitute a modification of the Agreement.

*Contract Is Not Illegal Under Arkansas or Federal Law.*

52.     Defendants' assertions that the Agreement to purchase the Dispensary is unenforceable under Arkansas and federal law, specifically the Controlled Substances Act, are unfounded.

. . . .

*The Agreement Is Not Void for Impossibility of Performance.*

60.     Defendants' assertions that the contract was impossible to perform because even if Defendant Murphy had signed the TOA, the MMC would not have allowed the transfer to be approved due to an apparent tax delinquency of Plaintiff Reeves, and that the contract was impossible to perform without the escrowing of the remaining purchase funds are also unfounded.

. . . .

64.     While the parties could have contracted to escrow the purchase funds, they specifically chose not to do so as memorialized by the Agreement, and Defendants were, in fact, the ones who insisted that the Agreement not provide for the escrow of the remaining purchase funds.

65.     It is not impossible to close the transaction as contemplated by the terms of Agreement as the parties could perform under the terms of the contract without the need to escrow the remaining purchase funds; therefore, the defense of impossibility is inapplicable here.

66.     Additionally, Defendants did not take "virtually every action within [their] power to perform [their] duty under the contract," instead, they refused to provide the signed TOA or the other necessary closing documents to Plaintiffs contrary to the terms of the Agreement.

67.     In *Smith v. Decatur School District*, the Court of Appeals held that the defense of impossibility is available where contracts are not performed "because of

19

valid orders" of a state agency.  2011 Ark. App. 126, at 6, 2011 WL 549057 at *3; *see also Mathews v. Garner*, 25 Ark. App. 27, 31, 751 S.W.2d 359, 361 (1988).

68.    Here, there is no order from the MMC denying Plaintiff Hansen's application for license to operate the Dispensary due to Reeves' tax lien or for any other reason which would otherwise make performance of the contract impossible, because Plaintiff Hansen has been unable to submit his application to the Commission due to Defendant Murphy's continued refusal to return the executed TOA to Plaintiffs; and therefore, the defense of impossibility is unavailable to Defendants without an actual order from the MMC.

This appeal followed.

### III.  *Standard of Review*

Summary judgment may be granted only when there are no genuine issues of material fact to be litigated, and the moving party is entitled to judgment as a matter of law.  *Greenlee v. J.B. Hunt Transp. Servs., Inc.*, 2009 Ark. 506, 342 S.W.3d 274.  The burden of sustaining a motion for summary judgment is always the responsibility of the moving party.  *McGrew v. Farm Bureau Mut. Ins. Co. of Ark.*, 371 Ark. 567, 268 S.W.3d 890 (2007).  Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact.  *Greenlee*, *supra.*  However, if a moving party fails to offer proof on a controverted issue, summary judgment is not appropriate, regardless of whether the nonmoving party presents the court with any countervailing evidence.  *Moses v. Bridgeman*, 355 Ark. 460, 139 S.W.3d 503 (2003).

On appellate review, this court determines if summary judgment was appropriate by deciding whether the evidentiary items presented by the moving party in support of the

motion leave a material fact unanswered. *Greenlee, supra.* We view the evidence in the light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* Our review focuses not only on the pleadings but also on the affidavits and other documents filed by the parties. *Id.* However, when there is no material dispute as to the facts, we determine on review whether "reasonable minds" could draw "reasonable" inconsistent hypotheses to render summary judgment inappropriate. *Town of Lead Hill v. Ozark Mountain Reg'l Pub. Water Auth.*, 2015 Ark. 360, 472 S.W.3d 118. In other words, when the facts are not at issue but possible inferences therefrom are, the court will consider whether those inferences can be reasonably drawn from the undisputed facts and whether reasonable minds might differ on those hypotheses. *Flentje v. First Nat'l Bank of Wynne*, 340 Ark. 563, 11 S.W.3d 531 (2000); *Mattox v. Main Entrance, Inc.*, 2021 Ark. App. 382.

IV. *Whether the Circuit Court Erred in Granting Appellees' Motion for Summary Judgment and Ordering Specific Performance*

On appeal, appellants (Sellers) generally argue that the circuit court erred in granting appellees' motion for summary judgment and ordering specific performance. As they did below, appellants make several arguments as to why the circuit court erred in finding that appellees were entitled to specific performance: (1) the MMC could not have lawfully approved a transfer of Fiddler's Green or its license to appellees; (2) appellees were never ready, willing, and able to pay the purchase price; (3) no contract existed without the conditions precedent being met; and (4) the circuit court erred in invalidating the parties'

21

written agreement to amend the APA. For the following reasons, we agree that the circuit court erred in granting appellees summary judgment and ordering specific performance. Accordingly, we reverse and remand for further proceedings.

In granting appellees' (Buyers') motion for summary judgment and ordering specific performance, the circuit court specifically found that the APA was unambiguous and required appellants to execute the TOA prior to closing before appellees were required to pay the remaining purchase price or escrow the remaining purchase funds. It therefore concluded that appellants' "conditioned refusal to provide Plaintiffs with the executed TOA constitutes a breach of contract as a matter of law, entitling Plaintiffs to summary judgment on their contract claims." We do not agree with this conclusion and hold that appellants' argument that the APA contained conflicting provisions that created an ambiguity has merit.

To succeed on a breach-of-contract claim, the plaintiff must show (1) the existence of a contract, (2) an obligation on the part of the defendant under the contract, (3) a failure to perform the obligation, and (4) resulting damages. *Barrows/Thompson, LLC v. HB Ven II, LP*, 2020 Ark. App. 208, 599 S.W.3d 637. The first rule of interpretation of a contract is to give to the language employed the meaning that the parties intended. *Wal-Mart Stores, Inc. v. Coughlin*, 369 Ark. 365, 255 S.W.3d 424 (2007). It is a well-settled rule that the intention of the parties is to be gathered, not from particular words and phrases, but from the whole context of the agreement. *Rausch Coleman Homes, LLC v. Brech*, 2009 Ark. App. 225, at 5, 303 S.W.3d 456, 458. Different clauses of the contract must be read together and the contract construed so that all its parts harmonize, if that is possible. *Id.*

22

When a contract is unambiguous, the circuit court applies the plain language of the parties' terms and determines as a matter of law how to apply the contract. *S. Constr., LLC v. Horton*, 2020 Ark. App. 361, 609 S.W.3d 16. A contractual provision is ambiguous when there is doubt or uncertainty as to its meaning so that it is open to at least two reasonable interpretations. *Id.* If an ambiguity is present, the circuit court may nonetheless apply the contract as a matter of law if the ambiguity can be resolved by referring to the contract. *Prochazka v. Bee-Three Dev., LLC*, 2015 Ark. App. 384, 466 S.W.3d 448. If the contract's terms cannot sweep away the initial uncertainty, then the court may look outside the contract. *Id.* When the terms of a contract are ambiguous and susceptible to more than one meaning, extrinsic evidence is permitted to establish the intent of the parties, and the meaning of the contract then becomes a question of fact. *Blanchard v. City of Springdale ex rel. Water & Sewer Comm'n*, 2019 Ark. App. 522, 588 S.W.3d 807. Considerable weight may be given to how the parties themselves understood a contract's terms, as shown by their subsequent statements, acts, and conduct. *Id.* Ambiguities in a written contract are construed strictly against the drafter. *S. Constr., LLC, supra.*

Here, appellees' (Buyers') counsel drafted the APA. At least six sections of the APA pertaining to the "closing" must be read in harmony. The first three relevant sections state the following:

> 2.2. <u>Payment of Purchase Price</u>. The Purchase Price shall be payable by Buyer as follows:
>
> > (a) Buyer shall deliver Twenty Thousand and No / 100 Dollars ($20,000.00) (the "Earnest Money") *to a third-party escrow agent* within three (3)

23

business days of Seller's execution of this Agreement, which shall be applied as follows: . . . .

> (ii) *At Closing*, the Earnest Money shall be delivered to Seller as part of the Purchase Price.
>
> (b) *At Closing*, Buyer shall deliver to Seller the remaining [specific dollar amount redacted.]
>
> (c) Buyer and Seller hereby agree that
>
> (i) the Purchase Price shall be payable *at Closing* in cash or other immediately available funds by wire transfer *at the Closing* . . . .

> 6.1 <u>Closing Date</u>. Closing or this Agreement (the "Closing") shall occur on or before the later of (i) August 1, 2020 and (ii) within five (5) business days following that date on which all Contingencies and Due Diligence set forth herein have been met, or at such other time as is mutually agreed upon by the Buyer and the Seller in writing (the "Closing Date").

> . . . .

> 6.4 <u>Deliveries by Buyer at Closing</u>. *At the Closing, Buyer will deliver to Seller:*
>
> (a) *The Purchase Price*; and . . .

(Emphasis added.)

Next, section 7.5 of the APA states that the "Buyer's obligation to close the subject transaction is subject to occurrence of certain events and completion of certain tasks, including . . . (c) Approval of the assignment and transfer of the License by the Arkansas Medical Marijuana Commission." However, section 6.3 of the APA states that "[a]t the Closing, Seller shall deliver or cause to be delivered to Buyer . . . (c) An assignment, executed by Seller, in the form acceptable to Buyer's counsel, to assign to Buyer all of Seller's rights in and to . . . the License[.]" Moreover, section 8 of the APA states that "[e]ach and every

24

obligation of Seller under this Agreement to be performed on or prior to the Closing Date, shall be subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions: . . . 8.2 . . . Buyer shall have performed and complied with all of its obligations under this Agreement which are to be performed or complied with by it prior to or at the Closing."

When reading all of these provisions together, the APA can be reasonably interpreted to state that the Seller was not required to perform its obligations (execute the purchase documents and license transfer) until the Buyer delivered the purchase price at closing, and the Buyer did not have to perform its obligations to fund the purchase price until the license had been transferred. As Sellers suggest, this conflict created the proverbial standoff between the "chicken and egg," which is not answered unambiguously within the APA. If the plain terms of the contract were applied as written in the four corners of the contract, the APA created a circular timeline under which neither party could fully perform.

Accordingly, because the meaning and timing of the various closing provisions could not be resolved by referring to the four corners of the agreement, and because reasonable minds could differ in its interpretation of the contract's provisions, we hold that the APA is ambiguous. Because the contract is ambiguous, on remand, the circuit court is allowed to look outside the contract and apply the contract-interpretation principles described above, including weighing how the parties themselves understood a contract's terms, as shown by their subsequent statements, acts, and conduct and construing any ambiguity against appellees who drafted the contract. *See Prochazka*, *supra*; *see also F&M Bldg. P'ship v. Farmers*

*& Merchs. Bank*, 316 Ark. 60, 871 S.W.2d 338 (1994) (holding that the chancellor properly admitted parol evidence to ascertain and give effect to the true intent of the parties); *S. Constr., LLC*, 2020 Ark. App. 361, 609 S.W.3d 16 (affirming the circuit court's finding that the contract was ambiguous and holding that the circuit court properly considered parol evidence); *JMD Constr. Servs., LLC v. Gen. Constr. Sols., Inc.*, 2019 Ark. App. 268, 577 S.W.3d 50 (holding that the circuit court properly considered parol evidence and extrinsic evidence in resolving an ambiguous contract). Further, because we are holding that the APA is ambiguous and remanding the case to the circuit court to interpret an ambiguous agreement, we need not determine whether the August 13 email from appellees' attorney, Cumming, to all the parties and appellants' attorney, Gilbert, constituted an amendment under the APA.

Here, appellees presented proof that Murphy acknowledged in her deposition that she did not want an escrow account when the parties signed the APA. However, the remainder of the proof presented by appellants, including the subsequent email exchanges, indicated that the parties agreed to, and intended for the terms of the APA to be satisfied through, the use of an escrow agent. In fact, each party unsuccessfully searched for an escrow agent. Accordingly, we hold that the circuit court erred in granting summary judgment and ordering specific performance. *See Prochazka*, *supra*. Accordingly, we must reverse and remand for further proceedings consistent with this opinion.

V. *Whether the Circuit Court Erred in Denying Appellants' Motion for Summary Judgment*

Finally, appellants argue that the circuit court erred in denying their motion for summary judgment. However, this issue is not properly before us in this interlocutory appeal

filed pursuant to Arkansas Rule of Appellate Procedure–Civil 2(a)(6). *See Travelers Indem. Co. v. Bd. of Trs. of the Univ. of Ark.*, 2022 Ark. 146, 646 S.W.3d 361.

VI. *Conclusion*

We reverse and remand this case to the circuit court for further proceedings consistent with this opinion. Because we reverse and remand for the reasons stated herein, it is unnecessary for us to opine on the remainder of appellants' arguments for reversal. *See Tilley v. Malvern Nat'l Bank*, 2019 Ark. 376, 590 S.W.3d 137.

Reversed and remanded.

GLADWIN and MURPHY, JJ., agree.

*McMath Woods P.A.*, by: *Timothy J. Giattina*; *Law Offices of Matt Simmons, Esq. Chtd.*, pro hac vice; and *Robert S. Tschiemer*, for appellants.

*Hall Booth Smith, PC*, by: *Baxter D. Drennon* and *Allison T. Scott*; and *Wright, Lindsey & Jennings LLP*, by: *Michael A. Thompson*, for appellees.